## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FORT SMITH DIVISION

| | |
|---|---|
| David Rodriguez, Carl Schoolfield, Tanada Smith, individually and on behalf of her minor children A.S. and K.S., Jessica Smedley, individually and on behalf of her minor children, C.S and A.S., Daniel Smedley, and Chris Cant, individually on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>Mena Hospital Commission d/b/a Mena Regional Health System,<br><br>    Defendant. | Case No. 2:23-cv-2002.<br><br>Hon. P. K. Holmes, III<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs David Rodriguez, Carl Schoolfield, Tanada Smith, individually and on behalf of her minor children A.S. and K.S., Jessica Smedley, individually and on behalf of her minor children C.S. and A.S., Daniel Smedley, and Chris Cant (collectively "Plaintiffs") bring this Consolidated Class Action Complaint against Mena Hospital Commission d/b/a Mena Regional Health System ("Mena"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1. On or around October 30, 2021, Mena, a regional healthcare network spanning throughout Polk County, Western Arkansas, and Eastern Oklahoma[1], lost control over its computer network and its patients' highly sensitive information in a data breach perpetrated by

---

[1] Mena, *Who We Are*, https://menaregional.com/about-us/who-we-are/ (last accessed Jan. 4, 2022).

cybercriminals (the "Data Breach"). On information and belief, the Data Breach affected approximately 84,814 individuals.[2]

2.      On November 8, 2022, Mena's internal investigation revealed that an unauthorized third party had accessed and removed a number of files from Mena's system over a year ago in the Data Breach.[3]

3.      On information and belief, the information compromised in the Data Breach encompasses both personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Private Information"), including but not limited to, full names, dates of birth, Social Security numbers, driver's license/government identification numbers, financial account information, medical record/patient account numbers, medical diagnosis/treatment information, medical provider names, lab results, prescription information, and health insurance information.

4.      On or around November 22, 2022, Mena notified victims of the Data Breach via letter ("Breach Notice"), stating:

_What Happened?_

An unauthorized party accessed and potentially removed a limited number of files from our resolution.

_What We Are Doing_

Upon detecting the incident, we commenced an immediate and thorough investigation and alerted law enforcement. As part of our investigation, we engaged leading cybersecurity experts to identify what personal information, if any, might have been present in the impacted files.

---

[2] _Mena Breach Report Results_ (Nov. 22, 2022), https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Mar. 21, 2023).
[3] Mena, _Notice of Data Security Incident_ (Nov. 8, 2022), originally posted at https://menaregional.com/notice-of-data-security-incident/ (last accessed Jan. 4, 2022), attached as Exhibit A.

*What Information was Involved*

After an extensive forensic investigation and manual document review, we discovered on November 8, 2022 that on or more of the files potentially removed by the unauthorized party on or about November 1, 2021 contained your full name, financial account information, medical record/patient account number(s), medical diagnosis/treatment and/or clinical information, medical provider name(s), and health insurance information.

5.     Mena's Breach Notice obfuscated the nature of the breach and the threat it posed—refusing to tell its victims how many people were impacted, how the breach happened, or why it took Mena over a year to identify the breach and begin notifying its victims.

6.     Although Mena downplays the incident with qualifiers like "potentially" and "limited," it is aware that cybercriminals intentionally targeted Mena for the highly sensitive Private Information it stores on its computer network, and attacked and bypassed the insufficiently secured network to exfiltrate the highly sensitive Private Information, including the Social Security numbers of both adults and children. As a result, the Private Information of Plaintiffs and Class Members remains in the hands of those cybercriminals.

7.     By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Mena assumed legal and equitable duties to those individuals to protect and safeguard the Private Information from unauthorized access and intrusion.

8.     Mena knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of Private Information misuse.

9.     The exposed Private Information of Plaintiffs and Class Members can—and likely will—be sold on the dark web. Hackers can offer for sale the unencrypted, unredacted Private Information to criminals. Plaintiffs and Class Members face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers—the gold standard for identity thieves.

10.     Additionally, as a result of Mena's delayed response, Plaintiffs and Class Members had no idea their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

11.     Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Mena's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Mena's inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Mena's conduct amounts to negligence and violates federal and state statutes.

12.     Plaintiffs and Class Members have suffered injury as a result of Mena's conduct. These injuries include, but are not limited to: (i) lost or diminished value of Private Information; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the benefits of their bargains with Mena, which they reasonably believed included the provision of reasonable and adequate data security to protect the Private Information they entrusted to Mena; and (v) the continued and substantially increased risk to their Private Information which remains unencrypted and available for unauthorized third parties to access and abuse and may remain backed up in Mena's possession and is subject to further unauthorized disclosures so long as Mena fails to undertake appropriate and adequate measures to protect the Private Information.

13.    Mena disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II.    PARTIES

14.    Plaintiff David Rodriguez is a Citizen of Smithville, Oklahoma residing in McCurtain County, Oklahoma.

15.    Plaintiff Carl Schoolfield is a Citizen of Cove, Arkansas residing in Polk County, Arkansas.

16.    Plaintiff Tanada Smith is a Citizen of Cove, Arkansas residing in Polk County, Arkansas. Ms. Smith is the mother and legal guardian of her minor children, A.S. and K.S., whose Private Information was compromised in the Data Breach.

17.    Plaintiff Jessica Smedley is a Citizen of Mena, Arkansas residing in Polk County, Arkansas. Ms. Smedley is the mother and legal guardian of her minor children, C.S. and A.S., whose Private Information was compromised in the Data Breach.

18.    Plaintiff Daniel Smedley is a Citizen of Mena, Arkansas residing in Polk County.

19.    Plaintiff Chris Cant is a Citizen of Arkansas residing in Polk County, Arkansas.

20.     Mena is organized under the laws of Arkansas, headquartered at 117 S. 2nd St., Augusta, Arkansas, with its principal place of business in Augusta, Arkansas.

21.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs. Plaintiffs will seek leave of court to amend this consolidated complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

22.     All of Plaintiffs' claims stated herein are asserted against Mena and any of their owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III.    JURISDICTION AND VENUE

23.     This Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because: "(1) there is minimal diversity; (2) the proposed class contains at least 100 members; and (3) the amount in controversy is at least $5 million in the aggregate." *Raskas v. Johnson & Johnson*, 719 F.3d 884, 886 (8th Cir. 2013) (quoting *Plubell v. Merck & Co.*, 434 F.3d 1070, 1071 (8th Cir. 2006)).

24.     The Western District of Arkansas has personal jurisdiction over Mena named in this action because Mena and/or its parents or affiliates are headquartered in this District and Mena conducts substantial business in Arkansas and this District through its headquarters, offices, parents, and affiliates.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Mena and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

*Mena*

26.    Mena is a regional medical service provider in Polk County, Western Arkansas and Eastern Oklahoma.[4] Mena provides inpatient and outpatient services and is accredited by the Arkansas State Department of Health and the Center for Medicare and Medicaid.[5] Mena is a healthcare provider under the Health Insurance Portability and Accountability Act ("HIPAA").

27.    Mena states its vision is to "be recognized as a leading model for regional healthcare in America by expanding our services and partnering with others to ensure we exceed the expectations of our customers."[6] Mena employs more than 76 people and boasts approximately $14 million in annual revenue.[7]

28.    In its Privacy Notice for Health Information Practices, Mena states that though "[e]ach time [a patient] visit[s] a hospital, physician, or other health care provider, a record of [the patient's] visit is made" Mena "will not use or disclose [patient] health information without [ ] authorization."[8]

29.    Mena also promises that it "is committed to maintaining the privacy of personal information in its possession" and the "privacy and security of the personal information [Mena] maintains is of the upmost importance"[9]

---

[4] *See Who We Are*, *supra* note 1.
[5] *Id.*
[6] *Id.*
[7] Richard Console, Jr., *Mena Regional Health System Reports Leaked SSNs and PHI Following Data Breach* (Dec. 1, 2022), https://www.jdsupra.com/legalnews/mena-regional-health-system-reports-3199091/ (last accessed Jan. 13, 2023).
[8] Mena, *Notice of Privacy Practices* (May 2014), https://menaregional.com/wp-content/uploads/2016/07/MRHSNPPMAY2014.pdf (last accessed Jan. 13, 2023).
[9] *See Notice of Data Security Incident*, *supra* note 3.

30.    As a healthcare provider that handles highly sensitive and personal information, Mena understood the need to protect its patients' Private Information and prioritize its data security.

31.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members relied on Mena to keep their Private Information confidential and securely maintained, and to make only authorized disclosures of this information.

32.    Despite recognizing its duty to do so, on information and belief, Mena has not implemented reasonable cybersecurity safeguards or policies to protect its patients' Private Information or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Mena leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to patients' Private Information.

***Mena's Data Breach***

33.    Plaintiffs are patients of Mena. As a condition of receiving healthcare services from Mena, Plaintiffs were required to provide Mena with their Private Information and in return, reasonably expect that Mena will safeguard their highly sensitive and confidential information. The Private Information entrusted to Mena by Plaintiffs and Class Members include:

       i.     First and Last names;

      ii.    Addresses;

    iii.    Phone numbers;

     iv.    Email addresses;

      v.    Dates of birth;

     vi.    Social Security numbers;

vii.    Marital status;

viii.    Employers' contact information;

ix.    Primary and secondary insurance policy holders' name, addresses, dates of birth, and Social Security numbers;

x.    Demographic information;

xi.    Driver's license or state or federal identification;

xii.    Information relating to the individual's medical and medical history;

xiii.    Insurance information and coverage; and

xiv.    Banking and/or credit card information.

34.    On information and belief, after collecting its patients' Private information, Mena maintains the unencrypted Private Information in its computer systems.

35.    Mena also creates and stores medical records and other protected health information for its patients, including records of treatments and diagnoses, lab results, and prescription information.

36.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Mena implicitly agrees to safeguard the data using reasonable means according to its internal policies and federal law. In other words, Mena knew or should have known that it was responsible to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

37.    Mena failed in its duties beginning on or about October 30, 2021, when its inadequate security practices resulted in the Data Breach,[10] when an unauthorized party removed

---

[10] *See Notice of Data Security Incident*, *supra* note 3.

a "number" of files from Mena's system.[11] Mena admits in its Breach Notice over a year later that the files removed by the cybercriminals "contained personal information [.]"[12]

38.    In other words, Mena's investigation revealed that its network had been hacked by cybercriminals and that Mena's inadequate cyber and data security systems and measures allowed those responsible for the cyberattack to obtain and steal files containing a treasure trove of thousands of Mena's patients' Private Information, including those of Plaintiffs and Class Members.

39.    In response to the Data Breach, Mena contends that it is "committed to maintaining the privacy of Personal information in its possession" and has or will be taking "many precautions to safeguard it. Mena continually evaluates and modifies its practices to enhance the security and privacy of the personal information it maintains."[13] Although Mena fails to expand on what these alleged "precautions" and "practices to enhance [] security and privacy" are, such precautions and practices should have been in place before the Data Breach.

40.    Additionally, although Mena claims it is "committed" to the privacy of its patients' Private Information, it did not even figure out that cybercriminals had stolen the Private Information held on Mena's systems for over a year, giving the cybercriminals free rein to abuse and sell Plaintiffs' and Class Members' Private Information.

41.    Despite its duties and alleged commitments to safeguard Private Information, Mena does not follow industry standard practices in securing patients' Private Information, as evidenced by the Data Breach.

---

[11] *Id*.

[12] *Id*.

[13] *Id*.

42.    Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class Members' Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class Members' financial accounts.

43.    Mena breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Mena's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to maintain an adequate data security system to reduce the risk of data breaches;

    b.    Failing to adequately protect patients' Private Information;

    c.    Failing to properly monitor its own data security systems for existing intrusions;

    d.    Failing to train its employees in the proper handling of emails containing the means by which the cyberattacks were able to first access Mena's networks, and to maintain adequate email security practices;

    e.    Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

    f.    Failing to comply with Federal Trade Commission ("FTC") guidelines for cybersecurity, in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45;

g.    Failing to comply with HIPAA; and

h.    Failing to adhere to industry standards for cybersecurity.

44.    As a result of antivirus and malware protection software in dire need of security updating, inadequate procedures for handling phishing emails or emails containing viruses or other malignant computer code, and other failures to maintain its networks in configuration that would protect against cyberattacks, Mena negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access Mena's IT systems and remove data which contained unsecured and unencrypted Private Information.

45.    As a result of the Data Breach, Plaintiffs and Class Members face an increased risk of fraud and identity theft. In addition, Plaintiffs and Class Members lost the benefits of their bargains with Mena, as Plaintiffs and Class Members would not have entered into agreements with Mena, and paid Mena for medical services or would have only been willing to pay substantially less for them, had they been aware of Mena's inadequate data security practices.

46.    Through its Breach Notice, Mena recognized the actual imminent harm and injury that flowed from the Data Breach, so it urged breach victims to use "best practices to protect their information."[14] This is ironic as Mena's own lack of implementing "best practices" to protect its patients' Private Information is what caused the Data Breach in the first place.

47.    Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Mena, is protected from further breaches.

48.    To date, Mena has done nothing to provide Plaintiffs and the Class Members with relief for the damages they have suffered as a result of the Data Breach. Mena has offered Plaintiffs

---

[14] *Id.*

and Class Members a mere 12 months of complimentary credit monitoring. But this is insufficient to compensate them for their damages incurred and time spent dealing with the Data Breach, particularly because the Data Breach has now placed Plaintiffs and Class Members at an increased risk of identity and credit fraud for the remainder of their lives. Signing up for this service requires Plaintiffs and Class Members to forfeit time that could otherwise be spent making money or enjoying life.

### *The Data Breach was a Foreseeable Risk of which Mena was on Notice.*

49.    Plaintiffs and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

50.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[15] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[16] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[17]

---

[15] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs* (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Oct. 27, 2021).
[16] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web* (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Oct. 27, 2021).
[17] *In the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Oct. 27, 2021).

51.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

52.    This Private Information demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[18]

53.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

54.    Individuals, like Plaintiffs and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

55.    Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

56.    The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee

---

[18] Tim Greene, *Anthem hack: Personal data stolen sells for 10X price of stolen credit card numbers* (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Aug. 23, 2021).

you a fresh start. This is especially true if your other Private Information, such as your name and address, remains the same."[19]

57.     Mena's data security obligations were also particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the Data Breach.

58.     According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[20]

59.     Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

60.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

61.     According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights]

---

[19] SSA, *Identity Theft and Your Social Security Number* (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Dec. 12, 2022).
[20] AdventHealth Univ., *5 Important Elements to Establish Data Security in Healthcare* (May 21, 2020), https://www.ahu.edu/blog/data-security-in-healthcare (last accessed Nov. 8, 2022).

OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[21]

62.    Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[22]

63.    The HIPAA Journal article goes on to explain that patient records, like those stolen from Mena, are "often processed and packaged with other illegally obtained data to create full record sets (the previously mentioned Fullz package) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[23]

64.    Data breaches such as the one experienced by Mena have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

65.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[24]

---

[21] HIPAA J., *Why Do Criminals Target Medical Records* (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last accessed Dec. 12, 2022).
[22] *Id.*
[23] *Id.*
[24] Maria Henriquez, *Iowa City hospital suffers phishing attack* (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

66.     These significant increases in attacks to companies, particularly those in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Mena.

67.     A study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[25] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[26]

68.     Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

69.     It is incorrect to assume that reimbursing a victim for a financial loss due to fraud makes that individual whole again. Similar to the GAO's study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving problems."[27] In fact, the

---

[25] Brian O'Connor, *Health Care Data Breach: What to Know About Them and What to Do After One* (Mar. 31, 2023), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed Mar. 21, 2023).
[26] *Id.*
[27] Erika Harrell, *Victims of Identity Theft*, DOJ (Nov. 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last accessed Mar. 21, 2023).

BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims."[28]

70.     As the fraudulent activity resulting from the Data Breach may not come to light for years, Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

*Mena Failed to Comply with FTC Guidelines*

71.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

72.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should do the following: protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[29]

73.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

---

[28] *Id.*
[29] FTC, *Protecting Personal Information* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Mar. 21, 2023).

74.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

75.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

76.     Mena failed to properly implement basic data security practices. Mena's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

### *Mena Failed to Comply with Industry Standards*

77.     As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

78.     To prevent and detect unauthorized cyberattacks, Mena could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy

Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with at least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and

logical separation of networks and data for different organizational units.[30]

79.    To prevent and detect cyberattacks, including the cyberattack that resulted in the

Data Breach, Mena could and should have implemented, as recommended by the United States

Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce

---

[30] *Id.* at 3–4.

malicious network traffic.[31]

80.     To prevent and detect cyberattacks, including the cyberattack that resulted in the

Data Breach, Mena could and should have implemented, as recommended by the Microsoft Threat

Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for

---

[31]  CISA, *Protecting Against Ransomware* (Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware.

Office [Visual Basic for Applications].[32]

81.     Given that Mena was storing the Private Information of Plaintiffs and Class Members, Mena could and should have implemented all of the above measures to prevent and detect cyberattacks.

82.     Mena failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

83.     The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Mena failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

*Mena Failed to Comply with Arkansas Law*

84.     Mena, as a "person or business that acquires, owns or licenses personal information about an Arkansas resident," held a statutory duty under the Arkansas Personal Information Protection Act to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Ark. Code Ann. § 4-110-104(a).

---

[32] Microsoft Security, *Human-operated ransomware attacks* (Mar. 5, 2020), https://www.micros oft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed Aug. 23, 2021).

*Mena Failed to Comply with HIPAA*

85.    HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[33]

86.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information is properly maintained.[34]

87.    The Data Breach itself resulted from a combination of inadequacies showing Mena failed to comply with safeguards mandated by HIPAA. Mena's security failures include, but are not limited to:

    a.    Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

    b.    Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

    c.    Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

---

[33] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[34] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.  Failing to ensure compliance with HIPAA security standards by Mena's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.  Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.  Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

88.  Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrated Mena failed to comply with safeguards mandated by HIPAA regulations.

### *Mena Failed to Protect Children's Private Information*

89.     According to a 2021 study by Javelin Research and Strategy, child identity fraud affects one out of every 500 children annually, costs U.S. families nearly $1 billion annually, and takes parents and guardians far longer to resolve than adult identity fraud.[35]

90.     According to this research, "One of the most daunting challenges, as it relates to detecting the theft or compromise of a child's identity, is that fraud typically takes place years after a child's personally identifiable information is initially breached." Because children are not filing taxes, applying for loans, and opening bank accounts, misuse of their Private Information is less often flagged early, and therefore can abused for much longer before detected.[36]

91.     A child's "blank slate" provides cyber criminals the opportunity to create a "synthetic" identity using both real and fictitious information to seek loans since a child's Social Security number completely lacks a credit history.[37]

92.     Cybercriminals armed with children's Social Security numbers, name, address, and dates of birth are able to commit a slew of illegal acts including applying for government benefits, like health care coverage or nutrition assistance; opening a bank or credit card account; applying for a loan; sign up for a utility service, like water or electricity; or renting a place to live.[38]

93.     Although checking a child's credit report is a step that concerned parents should take, it is more difficult than checking an adult's credit report. A child's credit check may require requesting that each of the three reporting agencies perform a manual search and may require

---

[35] Tracy Kitten, *Child Identity Fraud* (Nov. 2, 2021), https://javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss (last accessed Dec. 12, 2022).

[36] *Id.*

[37] IDRC, *What You Need to Know About Child Identity Theft?*, https://www.idtheftcenter.org/help_center/what-you-need-to-know-about-child-identity-theft/ (last accessed Dec. 12, 2022).

[38] FTC, *How To Protect Your Child From Identity Theft* (May 2021), https://consumer.ftc.gov/articles/how-protect-your-child-identity-theft (last accessed Dec. 12, 2022).

providing additional documentation, including but not limited to: the parent or legal guardian's driver's license or government-issued identification card; proof of the parent or legal guardian's address, (a utility bill, or a credit card or insurance statement); the child's birth certificate; and the child's Social Security card.[39] Each of these requirements can present hurdles—and are extremely time-consuming—for parents who receive notice of a data breach affecting a child. And for families with multiple children, like Plaintiffs Tanada Smith and Jessica Smedley, the hurdles rise exponentially.

94.     Data breaches at a hospital that treats minor children, like Mena, result in widespread and extremely long-term problems for their families, who may be reeling from the impact for years if not decades.

### Plaintiff David Rodriguez's Experience

95.     Plaintiff David Rodriguez ("Mr. Rodriguez") is a patient of Mena and entrusted his Private Information to Mena to receive services.

96.     At the time of the Data Breach, Mena retained Mr. Rodriguez's full name, financial account information, medical record/patient account number(s), medical diagnosis treatment and/or clinical information, medical provider name(s), and health insurance information.

97.     Mr. Rodriguez received Mena's Breach Notice on or around November 22, 2022. The Breach Notice stated that Mr. Rodriguez's Private Information was among the information accessed or acquired during the Data Breach.[40]

---

[39] *Id.*
[40] Plaintiffs' Breach Notices are attached as <u>Exhibit B</u>.

98.     After receiving the Breach Notice, Mr. Rodriguez contacted Mena regarding the Data Breach. Mena's employee notified Mr. Rodriguez that his Social Security number was also impacted during the Data Breach.

99.     After the Data Breach, Plaintiff received a letter from a collection agency about a fraudulent account opened in his name at Web Bank, and the collection agency claimed he owes $1400. This has impacted his credit score and required Plaintiff to spend significant time attempting to remediate this fraud.

100.    As a result of the Data Breach, Mr. Rodriguez spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Breach Notice, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. Specifically, Mr. Rodriguez has spent time resetting all of this automatic billing instructions related to his checking and savings account, freezing his credit, and monitoring his financial and medical accounts. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Mena's direction by way of the Breach Notice where Mena advised Mr. Rodriguez to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

101.    Mr. Rodriguez is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

102.    Mr. Rodriguez stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Mr. Rodriguez diligently chooses unique usernames and passwords for his various online accounts.

103.    Mr. Rodriguez suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Mr. Rodriguez entrusted to Mena, which was compromised in and as a result of the Data Breach.

104.    Mr. Rodriguez suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

105.    Mr. Rodriguez has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

106.    Mr. Rodriguez has a continuing interest in ensuring that his Private Information, which, upon information and belief, remain backed up in Mena's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Carl Schoolfield's Experience*

107.    Plaintiff Carl Schoolfield ("Mr. Schoolfield") is a patient of Mena and entrusted his Private Information to Mena to receive services. Mr. Schoolfield has been a patient with Mena for approximately the last 10 years.

108.    At the time of the Data Breach, Mena retained Mr. Schoolfield's full name, address, date of birth, Social Security number, and other personally identifiable information.

109.    Mr. Schoolfield received Mena's Breach Notice in or around December 2022, more than 13 months after the Data Breach occurred. The Breach Notice stated that Mr. Schoolfield's Private Information was among the information accessed or acquired during the Data Breach.

110.    Following the Data Breach, Mr. Schoolfield received an unwanted package mailed to his home address from The Home Depot containing a metal bracket that he did not order. Mr. Schoolfield contacted The Home Depot regarding the package and was informed a gift card was

used to make the purchase and send the same to Mr. Schoolfield. The contents of the package were of de minimis value and Mr. Schoolfield was instructed to keep them or throw them out. The Home Depot informed Mr. Schoolfield it would report the fraudulent purchase. Mr. Schoolfield also filed a police report regarding the fraudulent use of his home address.

111.    As a result of the Data Breach, Mr. Schoolfield spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Breach Notice, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. Specifically, Mr. Schoolfield has spent significant time responding to the fraudulent Home Depot purchase, applying for a credit freeze with the three major credit bureaus, and filing a police report regarding the fraudulent Home Depot purchase. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Mena's direction by way of the Data Breach notice where Mena advised Mr. Schoolfield to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

112.    Mr. Schoolfield is very careful about sharing his sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

113.    Mr. Schoolfield stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Mr. Schoolfield diligently chooses unique usernames and passwords for his various online accounts.

114.    Mr. Schoolfield suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Mr. Schoolfield entrusted to Mena, which was compromised in and as a result of the Data Breach.

115.    Mr. Schoolfield suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

116.    Mr. Schoolfield has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

117.    Additionally, since the Data Breach, Mr. Schoolfield has started receiving spam texts or spam phone calls.

118.    Mr. Schoolfield has a continuing interest in ensuring that his Private Information, which, upon information and belief, remain backed up in Mena's possession, is protected, and safeguarded from future breaches.

### Plaintiff Tanada Smith's Experience

119.    Plaintiff Tanada Smith's ("Ms. Smith") minor children, A.S. and K.S., are patients of Mena and their Private Information was entrusted to Mena to receive services.

120.    Ms. Smith received two Breach Notices dated November 22, 2022, related to Mena's Data Breach. Each Breach Notice was sent to her as the parent and legal guardian of her two minor children.

121.    Each Breach Notice provided a list of Private Information for each child that may have been included in the files exfiltrated. The list of information stolen in the two Breach Notices was not identical.

122.    A.S.'s letter stated that the stolen files contained the "full name, date of birth, medical diagnosis/treatment and/or clinical information, and health insurance information."

123.    K.S.'s letter stated that the stolen files contained the "full name, date of birth, Social Security number, medical record/patient account number(s), medical diagnosis/treatment and/or

clinic information, medical provider name(s), lab results, prescription information, and health insurance information."

124.   As a result of the Data Breach, Ms. Smith spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Breach Notices, self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. Specifically, Ms. Smith spent time monitoring her financial and medical accounts for fraud and changing her telephone number and plan in response to an increase in spam calls and texts. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Mena's direction by way of the Breach Notices where Mena advised Ms. Smith to mitigate her and her children's damages by, among other things, monitoring his accounts for fraudulent activity.

125.   Ms. Smith is very careful about sharing her minor children's sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

126.   Ms. Smith stores any documents containing her minor children's sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Ms. Smith diligently chooses unique usernames and passwords for his various online accounts.

127.   Ms. Smith's minor children. A.S. and K.S., suffered actual injury in the form of damages to and diminution in the value of their Private Information—a form of intangible property that Ms. Smith entrusted to Mena, which was compromised in and as a result of the Data Breach.

128.   Ms. Smith has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her minor children's privacy.

129. A.S. and K.S. have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of unauthorized third parties and possibly criminals. Unfortunately, Ms. Smith is unable to monitor her minor children's credit for identity theft because that is difficult or impossible to do for minors.

130. Additionally, since the Data Breach, for the past 6 months, Ms. Smith has started receiving spam texts or spam phone calls, sent to her phone number that she provided Mena as her contact information for the children's records. She receives approximately 8 spam calls or texts a day and was forced to change her telephone number and service plan.

131. Ms. Smith has a continuing interest in ensuring that her minor children's Private Information, which, upon information and belief, remain backed up in Mena's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Jessica Smedley's Experience*

132. Plaintiff Jessica Smedley's ("Ms. Smedley") minor children, C.S. and A.S., are patients of Mena and their Private Information were entrusted to Mena to receive services.

133. Ms. Smedley received two Breach Notices dated November 22, 2022, related to Mena's Data Breach. Each Notice was sent to her as the parent and legal guardian of her two minor children.

134. Each Breach Notice provided a list for that child that may have been included in the files exfiltrated.

135. C.S.'s letter stated that the stolen files contained the "full name, date of birth, Social Security number, financial account information, medical record/patient account number(s),

medical diagnosis/treatment and/or clinical information, lab results, medical provider name(s), and health insurance information."

136.    A.S.'s letter stated that the stolen files contained their "full name, date of birth, Social Security number, financial account information, medical record/patient account number(s), medical diagnosis/treatment and/or clinical information, lab results, medical provider name(s), and health insurance information."

137.    As a result of the Data Breach, Ms. Smedley spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Breach Notices, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. Specifically, Ms. Smedley spent time monitoring her financial accounts for fraud. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Mena's direction by way of the Breach Notices where Mena advised Ms. Smedley to mitigate damages by, among other things, monitoring accounts for fraudulent activity.

138.    Ms. Smedley is very careful about sharing her minor children's sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

139.    Ms. Smedley stores any documents containing her minor children's sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Ms. Smedley diligently chooses unique usernames and passwords for her various online accounts.

140.    C.S. and A.S. suffered actual injury in the form of damages to and diminution in the value of their Private Information—a form of intangible property that Ms. Smedley entrusted to Mena, which was compromised in and as a result of the Data Breach.

141.    Ms. Smedley has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her minor children's privacy.

142.    C.S. and A.S. have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of unauthorized third parties and possibly criminals. Unfortunately, Ms. Smedley is unable to monitor her minor children's credit for identity theft because that is difficult or impossible to do for minors.

143.    Ms. Smedley has a continuing interest in ensuring that her minor children's Private Information, which, upon information and belief, remain backed up in Mena's possession, is protected, and safeguarded from future breaches.

***Plaintiff Daniel Smedley's Experience***

144.    Plaintiff Daniel Smedley ("Mr. Smedley") is a Mena patient and entrusted his Private Information to Mena to receive services.

145.    At the time of the Data Breach, Mena retained Mr. Smedley's full name, financial account information, medical record/patient account number(s), medical diagnosis treatment and/or clinical information, medical provider name(s), and health insurance information.

146.    Mr. Smedley received Mena's Breach Notice on or around November 22, 2022. The Breach Notice stated that Mr. Smedley's Private Information was among the information accessed or acquired during the Data Breach.

147.    After receiving the Breach Notice, Mr. Smedley contacted Mena regarding the Data Breach. Mena's employee notified Mr. Smedley that his Social Security number was also impacted during the Data Breach.

148.    As a result of the Data Breach, Mr. Smedley spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Breach Notice, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Mena's direction by way of the Breach Notice where Mena advised Mr. Smedley to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

149.    Mr. Smedley is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

150.    Mr. Smedley stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Mr. Smedley diligently chooses unique usernames and passwords for his various online accounts.

151.    Mr. Smedley suffered, and continued to suffer, actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Mr. Smedley entrusted to Mena, which was compromised in and as a result of the Data Breach.

152.    Mr. Smedley suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

153.    Mr. Smedley has suffered, and continues to suffer, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

154.    Mr. Smedley has a continuing interest in ensuring that his Private Information, which, upon information and belief, remain backed up in Mena's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Chris Cant's Experience*

155.    Plaintiff Chris Cant ("Mr. Cant") is a patient of Mena and entrusted his Private Information to Mena to receive services.

156.    At the time of the Data Breach, Mena retained Mr. Cant's Private Information.

157.    Mr. Cant received Mena's Breach Notice on or around November 22, 2022. The Notice stated that Mr. Cant's Private Information was among the information accessed or acquired during the Data Breach.

158.    As a result of the Data Breach, Mr. Cant spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Breach Notice, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. Specifically, Mr. Cant has spent significant time monitoring his financial and medical accounts. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Mena's direction by way of the Breach Notice where Mena advised Mr. Cant to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

159.    Additionally, since the Data Breach, Mr. Cant has started receiving an increase in spam texts or spam phone calls.

160.    Mr. Cant is very careful about sharing his sensitive Private Information. Mr. Cant has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

161.    Mr. Cant stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Mr. Cant diligently chooses unique usernames and passwords for his various online accounts.

162.    Mr. Cant suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Mr. Cant entrusted to Mena, which was compromised in and as a result of the Data Breach.

163.    Mr. Cant suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

164.    Mr. Cant has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

165.    Mr. Cant has a continuing interest in ensuring that his Private Information, which, upon information and belief, remain backed up in Mena's possession, is protected, and safeguarded from future breaches.

## V.    CLASS ALLEGATIONS

166.    Plaintiffs bring this class action on behalf of themselves and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

167.    The Class that Plaintiffs seek to represent is defined as follows:

> All United States residents whose Private Information was actually or potentially accessed or acquired during the Data Breach event that is the subject of the Breach Notice that Mena published to Plaintiffs and other Class Members on or around November 22, 2022 (the "Class").

168.    Excluded from the Class are the following individuals and/or entities: Mena and Mena's parents, subsidiaries, affiliates, officers and directors, and any entity in which Mena has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including

but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

169.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

170.    <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1): The Class Members are so numerous that joinder of all Members is impracticable. Upon information and belief, there are approximately 84,814 individuals whose Private Information may have been improperly accessed in the Data Breach.

171.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

      a.    Whether and to what extent Mena had a duty to protect the Private Information of Plaintiffs and Class Members;

      b.    Whether Mena had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

      c.    Whether Mena had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

      d.    Whether Mena failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

      e.    Whether and when Mena actually learned of the Data Breach;

      f.    Whether Mena adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

      g.    Whether Mena violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

      h.    Whether Mena failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the

information compromised in the Data Breach;

i.   Whether Mena adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Mena engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

k.   Whether Mena violated the consumer protection statutes invoked herein;

l.   Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Mena's wrongful conduct;

m.   Whether Mena knowingly made false representations as to it data security practices;

n.   Whether Plaintiffs and Class Members are entitled to restitution as a result of Mena's wrongful conduct; and

o.   Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

172.   Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Mena's misfeasance.

173.   Policies Generally Applicable to the Class, This class action is also appropriate for certification because Mena has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Mena's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Mena's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

174.   Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of

interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

175.    <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large entities, like Mena. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

176.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Mena would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause

of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

177.    The litigation of the claims brought herein is manageable. Mena's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

178.    Adequate notice can be given to Class Members directly using information maintained in Mena's records.

179.    Unless a class-wide injunction is issued, Mena may continue in their failure to properly secure the Private Information of Class Members, Mena may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Mena may continue to act unlawfully as set forth in this Complaint.

180.    Further, Mena has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2).

181.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a.    Whether Mena owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

      b.    Whether Mena breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.     Whether Mena failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.     Whether an implied contract existed between Mena on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e.     Whether Mena breached the implied contract;

f.     Whether Mena adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.     Whether Mena failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

h.     Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Mena's wrongful conduct.

## VI.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
#### (On Behalf of Plaintiffs and the Class)

182.    Plaintiffs and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

183.    Plaintiffs and the Class entrusted Mena with their Private Information.

184.    Plaintiffs and the Class entrusted their Private Information to Mena on the premise and with the understanding that Mena would safeguard their information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

185.    Mena has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

186.    Mena knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

187.    Mena owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

188.    Mena's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Mena and its patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Mena was in a position to ensure that its systems was sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

189.    Mena's duty to use reasonable security measures under HIPAA required Mena to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

190.    Mena also had a duty to exercise appropriate clearinghouse practices to remove Private Information they were no longer required to retain pursuant to regulations.

191.    Mena also had a duty to have procedures in place to detect and prevent the improper access and misuse of the Private Information of Plaintiffs and the Class.

192.    Mena was subject to an "independent duty," untethered to any contract between Mena and Plaintiffs or the Class.

193.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Mena's inadequate security practices.

194.    Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Mena knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Mena's systems.

195.    Mena's own conduct created a foreseeable risk of harm to Plaintiffs and the Class. Mena's misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Mena's misconduct also included its decisions not to comply with industry standards for the safekeeping of the Private Information of Plaintiffs and the Class, including basic encryption techniques freely available to Mena.

196.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Mena's possession.

197.    Mena was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

198.    Mena had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Mena's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

199.    Mena had a duty to employ proper procedures to prevent the unauthorized dissemination of the Private Information of Plaintiffs and the Class.

200.    Mena has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

201.    Mena, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiffs and the Class during the time the Private Information was within Mena's possession or control.

202.    Mena improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

203.    Mena failed to heed industry warnings and alerts to provide adequate safeguards to protect the Private Information of Plaintiffs and the Class in the face of increased risk of theft.

204.    Mena, through its actions and/or omissions, unlawfully breached their duty to Plaintiffs and the Class by failing to have appropriate procedures in place to detect and prevent dissemination of Private Information.

205.    Mena breached its duty to exercise appropriate clearinghouse practices by failing to remove Private Information they were no longer required to retain pursuant to regulations.

206.    Mena, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Class the existence and scope of the Data Breach.

207.    But for Mena's wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, the Private Information of Plaintiffs and the Class would not have been compromised.

208.    There is a close causal connection between Mena's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Mena's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

209.    Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Mena, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Mena's duty in this regard.

210.    Mena violated Section 5 of the FTCA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Mena's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

211.    Plaintiffs and the Class are within the class of persons that the FTCA was intended to protect.

212.    The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses,

which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

213.    Mena also violated its duty under HIPAA by failing to use reasonable measures to protect PHI and by not complying with applicable regulations detailed *supra*. Here too, Mena's conduct was particularly unreasonable given the nature and amount of Private Information Mena collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

214.    Mena's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

215.    As a direct and proximate result of Mena's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remain in Mena's possession and is subject to further unauthorized disclosures so long as Mena fails to undertake appropriate and adequate measures to protect the Private Information of Plaintiffs and the Class; and (viii) present and continuing costs in terms of time, effort, and money

that has been and will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

216.    As a direct and proximate result of Mena' negligence and negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

217.    Additionally, as a direct and proximate result of Mena's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Mena's possession and is subject to further unauthorized disclosures so long as Mena fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

218.    As a direct and proximate result of Mena's negligence and negligence *per se*, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiffs and the Class)

219.    Plaintiffs and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

220.    Plaintiffs and the Class entrusted their Private Information to Mena. In so doing, Plaintiffs and the Class entered into implied contracts with Mena by which Mena agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

221.    In its Privacy Policy, Mena represented that it had a legal duty to protect Plaintiffs' and Class Members' Private Information.

222.    Plaintiffs and the Class fully performed their obligations under the implied contracts with Mena.

223.    Mena breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide timely and accurate notice to them that Private Information was compromised as a result of the Data Breach.

224.    As a direct and proximate result of Mena's above-described breach of implied contract, Plaintiffs and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

225.    As a direct and proximate result of Mena's above-described breach of implied contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (On behalf of Plaintiffs and the Class)

226.    Plaintiffs and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

227.    In providing their Private Information to Mena, Plaintiffs and Class Members justifiably placed a special confidence in Mena to act in good faith and with due regard for the interests of Plaintiffs and Class Members to safeguard and keep confidential that Private Information.

228.    Mena accepted the special confidence Plaintiffs and Class Members placed in it, as evidenced by its acknowledgement that it had a legal duty to protect Plaintiffs' and Class Members' Private Information.

229.    In light of the special relationship between Mena and Plaintiffs and Class Members, whereby Mena became a guardian of Plaintiffs' and Class Members' Private Information, Mena became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its customers, including Plaintiffs and Class Members for the safeguarding of Plaintiffs' and Class Members' Private Information.

230.    Mena has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its customer relationships, in particular, to keep secure the Private Information of its patients.

231.    Mena breached its fiduciary duties to Plaintiffs and Class Members by failing to protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

232.    Mena breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

233.    As a direct and proximate result of Mena's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Mena's possession and is subject to further unauthorized disclosures so long as Mena fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of the services they paid for and received.

234.    As a direct and proximate result of Mena's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm and other economic and non-economic losses.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Class)**

235.    Plaintiffs and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

236.    This cause of action is brought in the alternative to Plaintiffs' and Class Members' breach of implied contract claim.

237.    Plaintiffs and Class Members conferred a monetary benefit on Mena, by providing Mena with their valuable Private Information.

238.    Mena enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

239.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Mena instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Mena's failure to provide the requisite security.

240.    Under the principles of equity and good conscience, Mena should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Mena failed to implement appropriate data management and security measures that are mandated by industry standards.

241.    Mena acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

242.    If Plaintiffs and Class Members knew that Mena had not secured their Private Information, they would not have agreed to provide their Private Information to Mena.

243.    Plaintiffs and Class Members have no adequate remedy at law.

244.    As a direct and proximate result of Mena's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private

Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Mena's possession and is subject to further unauthorized disclosures so long as Mena fails to undertake appropriate and adequate measures to protect Private Information in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

245.    As a direct and proximate result of Mena's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

246.    Mena should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

## COUNT V
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and Class)

247.    Plaintiffs and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

248.    Plaintiffs and the Class had a legitimate expectation of privacy to their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

249.    Mena owed a duty to its current and former patients, including Plaintiffs and the Class, to keep their Private Information contained as a part thereof, confidential.

250.    Mena failed to protect and released to unknown and unauthorized third parties the Private Information of Plaintiffs and the Class.

251.    Mena allowed unauthorized and unknown third parties to access and examine the Private Information of Plaintiffs and the Class, by way of Mena's failure to protect the Private Information.

252.    The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and the Class is highly offensive to a reasonable person.

253.    The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and the Class disclosed their Private Information to Mena as part of Plaintiffs' and the Class's relationships with Mena, but privately with an intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

254.    The Data Breach at the hands of Mena constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

255.    Mena acted with a knowing and intentional state of mind when it permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

256.    Because Mena acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and the Class.

257.    As a proximate result of the above acts and omissions of Mena, the Private Information of Plaintiffs and the Class was disclosed to third parties without authorization, causing Plaintiffs and the Class to suffer damages.

258.    Unless and until enjoined, and restrained by order of this Court, Mena's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class in that the Private Information maintained by Mena can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs or Class Members.

### COUNT VI
### DECLARATORY JUDGMENT
### (On Behalf of Plaintiffs and the Class)

259.    Plaintiffs and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein fully set forth herein.

260.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

261.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Private Information and whether Mena is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Private Information. Plaintiffs allege that Mena's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise

of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

262.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    Mena owes a legal duty to secure patients' Private Information and to timely notify consumers of a data breach under the common law, Section 5 of the FTCA, and HIPAA; and

      b.    Mena continues to breach this legal duty by failing to employ reasonable measures to secure patients' Private Information.

263.    This Court also should issue corresponding prospective injunctive relief requiring Mena to employ adequate security protocols consistent with law and industry standards to protect patients' Private Information.

264.    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Mena. The risk of another such breach is real, immediate, and substantial. If another breach at Mena occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

265.    The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Mena if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Mena of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Mena has a pre-existing legal obligation to employ such measures.

266.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Mena, thus eliminating the additional injuries that would result to Plaintiffs and consumers whose confidential information would be further compromised.

## COUNT VII
## VIOLATION OF THE STORED COMMUNICATIONS ACT,
### 18 U.S.C. §§ 2701, *et seq.*
### (On Behalf of Plaintiffs and the Class)

267.    Plaintiffs and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein fully set forth herein.

268.    The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, *et seq.*, provides consumers with redress if a company mishandles their electronically stored information, such as Private Information. The SCA was designed, in part, to protect individuals' privacy interests in personal and proprietary information.

269.    Section 2702(a)(1) of the SCA states that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

270.    "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

271.    Through its computer equipment, Mena provides an "electronic communication service to the public" within the meaning of the SCA.

272.    By failing to take reasonable steps to safeguard Plaintiffs' and Class Members' Private Information while in electronic storage, Mena has allowed unauthorized access to its electronic systems and knowingly divulged patient Private Information.

273.    Section 2702(a)(2)(A) of the SCA provides that "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service on behalf of, and received by means of electronic transmission from (or created by means of computer processing or communications received by means of electronic transmission from), a subscriber or customer of such service." 18 U.S.C. § 2702(a)(2)(A).

274.    "Remote computing service" is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2).

275.    "Electronic communications system" is defined as "any wire, radio, electromagnetic, photo-optical or photo electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C § 2510(14).

276.    Mena stores its patients' Private Information and utilizes such information to provide services to its patients.

277.    By failing to take reasonable steps to safeguard Private Information and allowing its computer systems to be breached, Mena knowingly divulged Plaintiffs' and Class Members' Private Information, and which allowed unauthorized persons to access and use the Private Information for improper purposes.

278.    Upon learning that its systems had been intruded upon and information had been obtained and accessed by unauthorized third parties, Mena failed to promptly inform Plaintiffs and Class Members of the data breach and continued to knowingly divulge Private Information to third parties.

279.    Plaintiffs and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Mena and that the Court grant the following:

A.    For an Order certifying the Class and appointing Plaintiffs and their Counsel to represent the Class;

B.    For equitable relief enjoining Mena from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an Order:

i.    prohibiting Mena from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Mena to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Mena to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Mena can provide to the Court reasonable justification for the retention and use of such information

when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Mena to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v.    prohibiting Mena from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.    requiring Mena to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Mena's systems on a periodic basis, and ordering Mena to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Mena to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Mena to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Mena to segment data by, among other things, creating firewalls and access controls so that if one area of Mena's network is compromised, hackers cannot gain access to other portions of Mena's systems;

x.    requiring Mena to conduct regular database scanning and securing checks;

xi.    requiring Mena to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as

well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.    requiring Mena to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    requiring Mena to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Mena's policies, programs, and systems for protecting personal identifying information;

xiv.    requiring Mena to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Mena's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Mena to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.    requiring Mena to implement logging and monitoring programs sufficient to track traffic to and from Mena's servers; and

xvii.    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Mena's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for Plaintiffs and the Class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand that this matter be tried before a jury.


Date: May 22, 2023                          Respectfully Submitted,


/s/ Randall K. Pulliam
Randall K. Pulliam (AR Bar 981105)
Courtney E. Ross (AR Bar 2021156)
**CARNEY BATES & PULLIAM, PLLC**
519 West 7th Street
Little Rock, AR 72201
Telephone: (501) 312-8500
Fax: (501) 312-8505
rpulliam@cbplaw.com
cross@cbplaw.com

*Interim Liaison Counsel*

Bryan L. Bleichner (admitted *pro hac vice*)
Philip J. Krzeski (admitted *pro hac vice*)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
bbleichner@chestnutcambronne.com
pkrzeski@chestnutcambronne.com

Danielle L. Perry (admitted *pro hac vice*)
Gary E. Mason (admitted *pro hac vice*)
Lisa A. White (admitted *pro hac vice*)
**MASON LLP**
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Telephone: (202) 429-2290
dperry@masonllp.com
gmason@masonllp.com
lwhite@masonllp.com

*Interim Co-Lead Class Counsel*

Josh Sanford (AR Bar No. 2001037)
**SANFORD LAW FIRM, PLLC**
10800 Financial Centre, Parkway, Suite 510
Little Rock, Arkansas 72211
Telephone: (501) 787-2040
josh@sanfordlaw.com

Gary M. Klinger (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Breean Walas (AR Bar No. 2006077)
**WALAS LAW FIRM**
711 West 3rd Street
Little Rock, AR 72201
Telephone: (501) 246-1067
breean@walaslawfirm.com

Thiago Coelho (admitted *pro hac vice*)
**WILSHIRE LAW FIRM**
3055 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90010
Telephone: (213) 381-9988
Fax: (213) 381-9989
thiago@wilshirelawfirm.com

Christopher D. Jennings
**JOHNSON FIRM**
610 President Clinton Avenue, Suite 300
Little Rock, AR 72201
Telephone: (501) 372-1300
chris@yourattorney.com

Gary F. Lynch (admitted *pro hac vice*)
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Fax: (412) 231-0246

glynch@lcllp.com

Joseph Gates (AR Bar 2010239)
**GATES LAW FIRM**
2725 Cantrell Road, Suite 105
Little Rock, Arkansas 722202
Telephone: (501) 779-8091
Fax: (479) 269-9788
Gates@gateslawpllc.com

Raina Borrelli (*pro hac vice*)
**TURKE & STRAUS LLP**
613 Williamson Street, Suite 201
Madison, WI 53703
Telephone: (608) 237-1775
Fax: (608) 509-4423
rborrelli@turkestrauss.com